THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CAROLINE B. STRONG, Appellant.

Court of Special Sessions of City of New York, Appellate Part, First Department, October 3, 1944.

*John W. Hood* for appellant.

*Frank S. Hogan, District Attorney (Alan J. Elliott of counsel)*, for respondent.

BAYES, Ch. J.   Appeal by defendant from judgment rendered March 17, 1944, in the Magistrate's Court of the City of New

York, Washington Heights District, Borough of Manhattan, convicting her of a violation of subdivision 3 of section 899 of the Code of Criminal Procedure. Sentence was suspended.

The complaint, verified by policewoman Gertrude Grunin, charged that: " At about 2:00 P.M. on the 26th day of October, 1943, she visited Room 408 of premises 100 West 72nd Street, Borough of Manhattan, City, County and State of New York, where defendant held a meeting. An assistant passed out paper and pencils on which the deponent was instructed to write questions she wished answered. The defendant answered the questions as follows:

" ' Your husband will be drafted in the second call, but not the first. Your father-in-law's condition will improve. You will hear from your brother, but a furlough is not expected. The property will give you too much trouble. It is not advisable to buy at this time.'

" Deponent placed Fifty Cents (50¢) in a basket which an assistant passed around for this purpose.

" Deponent stated that at 8:00 P.M. on the 28th day of October, 1943, she revisited defendant and had other questions answered. Defendant in answer to written questions, stated:

" ' You will have two children. Your husband will be successful in his new position. It will be a good change.'

" Deponent again placed the sum of Fifty Cents (50¢) in a basket passed around by the assistant for this purpose."

Subdivision 3 of section 899 of the Code of Criminal Procedure reads as follows:

" Section 899. · *Who are disorderly persons.*

" 3. Persons pretending to tell fortunes, or where lost or stolen goods may be found; but this subdivision shall not be construed to interfere with the belief, practices or usages of an incorporated ecclesiastical governing body or the duly licensed teachers or ministers thereof acting in good faith and without personal fee ".

The evidence offered by the People in support of the allegations of the complaint was adduced from two policewomen, one of whom testified that on October 26, 1943, at about 2:00 P.M. she visited a room on the fourth floor of premises 100 West 72nd Street, New York City. The building is described as a seven-story office building and the room in question contained about thirty-five folding chairs in front of which was a high pedestal upon which were a large book and a candelabra and on the walls an American flag and some religious pictures. Upon entering the room this policewoman was handed a pencil

and a pad upon which she wrote four questions. The attendant then exhibited a basket and the policewoman asked, "What is the usual charge?" to which the reply was "50¢". The witness then placed that sum in the basket. At that time there were five other visitors in the room. A short time thereafter, defendant came in and took charge of the meeting, first reading a short passage from the Bible which took four or five minutes and then answering questions. When defendant came to the witness she told her she was supersensitive but would reach success if she asserted herself. In answering the witness' questions she declared: "Your husband will not be drafted in the first call, but he will in the second. * * * Your father-in-law's condition will improve. He has to take good care of himself. * * * Your brother will not receive a furlough, but you will receive a letter from him. * * * Concerning the property you mentioned, it is not a good time to buy the property right now, especially during war-time conditions." Answering questions took approximately one hour during which time nothing occurred other than the initial reading of the Bible and the answering.

On October 28, 1943, at about 8:00 P.M. this witness again visited the premises at which time about twenty-three persons were present. She went through the same procedure as before, receiving a pencil and pad upon which she wrote two questions and handed them to the attendant with fifty cents. Defendant after reading a religious prayer which lasted about two minutes took up the questions. She told the witness that she was supersensitive and would reach a successful life; that she would have two children and that the opportunity for her husband to obtain a new position was quite good and a change would help him. She further testified that after the persons present received their readings they left the meeting room; also that on the door of the meeting room there was hung a sign reading: "C. B. Strong".

The other policewoman testified that she visited the premises on October 26, 1943, at which time there were five other visitors. She went through the same procedure as the first witness, placing fifty cents in the basket. When defendant appeared she opened the meeting with a prayer lasting about five minutes and then took up the questions. She told the witness that she was intuitive and had great ability and answered her questions as follows: "She said as to the first one, 'Don't worry about it. Most likely everything will be all right.' That question that I had asked was that I was sick and I had not been

able to find out what was wrong with me and would I be all right.. And the second question the answer she gave me was that we are all passing through a period of anxiety at the time and she realized how anxious I was but in all probability what I feared would happen, but she did not see any accidents befalling him, words to that effect. And the question which she was answering at that time was: ' Would my husband go overseas?' And that is the answer she gave me. The next question that I asked was: ' Would I have any children?' And she said in all probability that I would have two.'' The witness left the room after receiving her answers and the other persons did likewise.

Defendant's witnesses included, among others, the president of the General Assembly of Spiritualists of New York State who testified that the Assembly was '' an ecclesiastical organization, a religious body, incorporated under the laws of 1914 of New York State''; that defendant was '' an ordained minister '' and '' the pastor of the Third Spiritualist Church '', having been ordained about twenty years ago. He .further testified that he was familiar with the tenets of the General Assembly and that it recognized prophecy as '' one of the phases of mediumship''; that '' prophecy is given for the purpose of consolation, encouragement, and at the same time of bringing definite proof of the fact of immortality''; that spiritualism condemned '' fortune telling ''. He defined a fortuneteller as one who '' merely pretends to prophecy for personal gain ''. He also asserted that it was proper for a church to hold '' circle meetings '' consisting of a '' very brief service and mostly message work ''.

Upon cross-examination he testified that '' the medium tries to encourage the individual and to uplift him ''. At the same time if he gets a message, he begins to wonder, '' How does that medium know this?''; and then he finds out how it is possible, and then in that way he gets in touch with spiritualism. It is just like an advertising sign that the storekeeper puts out that attracts attention.

Another witness for defendant, vice-president .of the Board of Trustees of the Third Spiritualist Church, testified the church consists of ten members; that its sole income was derived from message services and contributions of $2.50 a month from each member; that from its income defendant, the pastor, was paid thirty dollars per week salary. He asserted it was the regular practice for the minister to answer ques-

tions, material or otherwise, which involve in any way future events.

The secretary of the church testified she had been such for fourteen years; that on the dates in question there was a sign above the secretary's desk reading, "The Church does not charge for any message." The witness admitted passing the basket around, but denied having told complainant there was a charge for the message.

Defendant testified she has been pastor of the church for about twenty years; that she received the messages from external sources, adding, "from those that departed". She asserted that the church rules required her, as pastor, to deliver a talk on the tenets of the church explaining the meaning of spiritualism and that on the days in question she delivered such talks.

The magistrate held the questions and answers were not, as such, distinguishable from ordinary fortune telling which is condemned by the statute. Upon the entire case he reached the conclusion that defendant at the times complained of was not acting in good faith, which he defined as "acting in a sincere endeavor to administer the beliefs, practices, or usages of defendant's religion".

The term "good faith" has no fixed legal definition that may be applied to all actions. For the purposes of the instant case we think the magistrate's definition may be accepted. From the testimony of John Heiss, president of the General Assembly of Spiritualists of the State of New York, it is clear that the "message services" do not constitute a prescribed, essential part of the spiritualist practices and faith. In any event the questions set forth in the complaint do not differ from those usually submitted to and answered by the ordinary fortune teller, and in our opinion the magistrate was justified in finding from the evidence that defendant was not acting in good faith; and this irrespective of whether or not the so-called message services were included within the "belief, practices or usages" of the Spiritualist Church.

We may add that the element of good faith is a question of fact to be determined by the trial court upon all the relevant evidence. In reaching his conclusion the magistrate had the advantage of seeing the witnesses and observing their manner when testifying.

In support of the magistrate's decision it may be pointed out: (a) that the so-called "message service" was almost entirely devoid of any religious presentation or exposition;

(b) that the meeting room, located on the fourth floor of an office building, had nothing appearing on the door other than the name of defendant; (c) that the manner in which the affairs of the church were conducted indicated that defendant was the controlling influence, pretty much free from any substantial restraint or direction on the part of the General Assembly or Board of Trustees; and (d) that the church had what might be called a mere skeleton membership of ten persons.

From a reading of the record as a whole it seems to us that the magistrate might also have based his decision upon the ground that the message services were so conducted that defendant derived a " personal fee " therefrom. Certainly she was in complete control of her organization and derived no substantial amounts outside of the basket collections taken up in connection with the message services.

The judgment should be affirmed.

PAIGE and WIEBOLDT, JJ., concur.

Judgment affirmed.